UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALFA CONSULT SA,

Plaintiff,

v.

TCI INTERNATIONAL, INC.,

Defendant.

Case No.  21-cv-00812-BLF

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT TCI INTERNATIONAL, INC'S MOTION FOR SUMMARY JUDGMENT**

Re: ECF. No. 75

This action arises out of a contractual relationship between Plaintiff Alfa Consult SA ("Alfa"), a construction company with expertise in information technology projects, and Defendant TCI International, Inc. ("TCI"), a supplier of spectrum monitoring and communications intelligence systems, regarding bids made to an Iraqi governmental agency.  Presently before the Court is TCI's Motion for Summary Judgment (the "Motion") on Alfa's Amended Complaint, which asserts claims for breach of contract; breach of the covenant of good faith and fair dealing; negligent and tortious interference with prospective economic advantage; tortious interference with contract; and aiding and abetting both types of tortious interference.  *See* Mot. for Summ. J. ("Mot."), ECF No. 75.  The Court heard oral argument on the Motion on July 27, 2023.  Having considered the briefing and oral argument of the parties, as well as the governing law, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion.

## I.      BACKGROUND

### A.      Parties

The following facts are undisputed unless otherwise noted.  TCI is a California-based company that is a worldwide supplier of radio frequency spectrum monitoring equipment.  Decl. of Ann Ballard-Bustamante ("Ballard-Bustamante Decl."), ECF No. 75-1, ¶ 5.  Alfa is a

1    Luxembourg corporation that works on information technology ("IT") construction projects

2    around the world, including, as relevant for this action, in Iraq.  Am. Compl., ECF No. 68, ¶ 9;

3    Decl. of Oleksiy Gorpinich ("Gorpinich Decl."), ECF No. 86-1, ¶ 4.

          **B.      The 2016 Request for Proposal**

5              Iraq's Communications and Media Commission (the "CMC") is the governmental agency

6    responsible for the "regulation of the electronic communications industry and markets" in Iraq.

7    Decl. of Catherine Owens ("Owens Decl.") Exh. 5, at 4, ECF No. 86-4.[1]  In June 2016, the CMC

8    issued a request for proposal (the "2016 RFP") for a spectrum management and monitoring system

9    ("SMMS").  *Id.* at 1.  TCI and Alfa discussed partnering on submitting a bid for the 2016 RFP and

10   on September 9, 2016, after various negotiations, executed a contract (the "Teaming Agreement")

11   "set[ting] forth the general terms for an exclusive working relationship . . . to prepare a proposal

12   for submission to the CMC [for the 2016 RFP]."  Decl. of Gregory C. Ulmer ("Ulmer Decl."),

13   ECF No. 75-2, Exh. 10 ("Teaming Agr."), at 1; *see also* Owens Decl., Exh. 39.

14           Under the Teaming Agreement, Alfa would be the prime contractor on any bid for the

15   CMC's SMMS project, and TCI would be Alfa's subcontractor.  Teaming Agr. § 3.  The Teaming

16   Agreement was set to expire upon the occurrence of any one of five enumerated events, including

17   the passage of 12 months from the date of the Teaming Agreement without a contract award, and

18   the CMC's cancelation or withdrawal of the project requirements.  *See id.* §§ 13(b), (d).  Pursuant

19   to the Teaming Agreement, the parties submitted a bid to the CMC on September 18, 2016.  Am.

20   Compl. ¶ 23; *see also* Ulmer Decl., Exh. 15.  However, the CMC canceled the 2016 RFP by late

21   November or early December 2016.  *See* Ulmer Decl., Exhs. B-2, B-3.

          **C.      The Territory Agreement**

23           Both Alfa and TCI believed the CMC would reissue a request for proposal for an SMMS

24   project.  *See* Ulmer Decl., Exhs. B-5, B-6; Owens Decl., Exh. F ("Ballard-Bustamante Dep. Tr.

25   Vol. 1"), at 58:23–59:9.  The parties engaged in further negotiations and on February 13, 2017

26

27   _____

[1] The parties submitted as evidence numerous documents written in Arabic purportedly issued by
     the CMC.  *See, e.g.*, Decl. of Furat Al Mumin, Exhs. 81, 90, 92; Owens Decl., Exhs. 94, 97, 98.
28   The Court will not cite to the contents of any document for which it does not have a certified
     English translation, although it may cite to other evidence describing related circumstances.

United States District Court
Northern District of California

1    executed a contract titled "Exclusive Agency Agreement for the Territory of Iraq" (hereinafter the

2    "Territory Agreement").  Ulmer Decl., Exh. 26 ("Territory Agr."); *see also, e.g.*, Ulmer Decl.,

3    Exh. 23.

4         The Territory Agreement defined TCI as the "Company" and Alfa as the "Representative,"

5    and stated that the "Company seeks Representative's services in securing the award of the Project

6    as defined in Appendix 1."  Territory Agr. §§ I-II, 1.1.  Appendix 1 defined the Project as

7    "consist[ing] of the marketing and pursuit of the sales opportunity for the Products related and

8    specific to the Project(s) described in Table-1 below."  *Id.* at App'x 1, § 2(a).  Table-1 described

9    the Project as "TCI Project No. 61930."  *Id.* at App'x 1, Table-1.  TCI Project 61930 refers to the

10   CMC's SMMS request.  *See, e.g.*, Teaming Agr. 1 ("Alfa has identified an opportunity to provide

11   TCI's products and services for the [CMC] for a Spectrum Management and Monitoring System

12   (TCI Project Number 61930 hereinafter called 'Program').").  The signature page of the Territory

13   Agreement provided a clause titled "Exclusivity" stating that "This Agreement shall be Exclusive

14   within [Iraq]," Territory Agr. § 4.1, and a clause establishing that TCI and Alfa "agree[d] to abide

15   by and be subject to the additional terms set out in Appendix 2 of this Agreement," Territory Agr.

16   § 5.1.  Appendix 2 stated that "nothing in this Agreement shall be interpreted or deemed to create

17   a partnership, agency, . . . or other relationship between" TCI and Alfa.  *Id.* at App'x 2, § 1.1.  It

18   further provided that TCI "need not negotiate or consummate any agreement with anyone

19   identified by [Alfa], need not avail itself of [Alfa's] assistance in negotiating, consummating, or

20   servicing any agreement, and may locate and deal directly with prospective or existing customers

21   through its own company personnel or other representatives."  *Id.* at App'x 2, § 4.4.

22        On March 8, 2017, TCI signed before a notary public a letter—the "Exclusive Commercial

23   Agency for the Country of Iraq" (hereinafter the "Agency Letter")—certifying that Alfa "is the

24   exclusive commercial agent for TCI in Iraq and is exclusively authorized to represent and resell

25   TCI's solutions and products in the country of Iraq."  Owens Decl., Exh. A-2 ("Agency Letter"),

26   at 4.  The Agency Letter provided that its authorization, "subject to the Agency Agreement

27   between Alfa [] and TCI [], is valid until 31 December 2019."  *Id.*

28

United States District Court
Northern District of California

3

### D.     The 2018 Request for Proposal

On August 9, 2018, the CMC released a new request for proposal (the "2018 RFP"). Gorpinich Decl. ¶ 8.  The 2018 RFP—like the 2016 RFP—concerned the implementation of a spectrum management and monitoring system.  *See* Owens Decl., Exh. A-1.  Proposals responding to the 2018 RFP were due on September 10, 2018.  Gorpinich Decl. ¶ 11.

On August 10, 2018, TCI informed Alfa by email that it intended to pursue opportunities in Iraq separately from Alfa.  Ulmer Decl., Exh. 29.  TCI stated that the Teaming Agreement had expired and that TCI did not wish to renew it.  *Id.*  TCI further stated that it was rescinding three letters—two manufacturer's authorization letters and a commercial agency letter—dated in 2016 because they were "all provided in conjunction with the teaming agreement for the 2016 [RFP], and this teaming agreement has now expired," and that the authorizations in the letters were no longer valid.  *Id.*

An Alfa consultant spoke to TCI representatives on August 16, 2018.  Decl. of Furat Al Mumin ("Al Mumin Decl.") ¶ 23, ECF No. 86-2.  TCI informed Alfa that it was working with another company that was well-connected to the CMC's proposal committee and could make TCI's bid more competitive.  *Id.*  TCI and Alfa spoke again on August 21, 2018 to discuss entering into a non-exclusive teaming agreement so that TCI could be the supplier on two bids, but TCI informed Alfa the next day that it "w[ould] not be able to team with Alfa," as the CMC prohibited suppliers from bidding with more than one prime contractor.  *See* Ulmer Decl., Exh. 30.  TCI entered into a teaming agreement with Al Zaman Group ("AZG") on September 1, 2018, and subsequently submitted a bid with AZG for the 2018 RFP.  Ballard-Bustamante Decl. ¶ 13.

On September 10, 2018, Alfa submitted a bid for the 2018 RFP that also listed TCI as its supplier.  Gorpinich Decl. ¶ 11; *see* Ulmer Decl., Exh. 32.  That same day, TCI learned of Alfa's bid from AZG, which provided "advance information" about the other bidders and the proposal amounts.  Owens Decl., Exh. 64, at 1–2.  TCI internally discussed the mechanisms for informing the CMC that it had not authorized Alfa to make the bid.  *See* Owens Decl., Exh. 64, at 2.

### E.     Iraqi Governmental and Judicial Actions

Alfa had experience contracting with the CMC prior to the issuance of the 2016 RFP.  In

1    2014, the CMC awarded Alfa two projects, both of which Alfa finished by 2017.  Al Mumin Decl.

2    ¶ 14.  On August 16, 2018, the CMC awarded Alfa two ongoing contracts to maintain the systems

3    at issue in the 2014 projects (the "Maintenance Contracts").  *Id.* ¶ 18; Gorpinich Decl. ¶ 12.

4           TCI provided AZG with a letter stating TCI had not partnered with Alfa for the 2018 RFP,

5    which AZG in turn provided to the CMC.  *See* Owens Decl., Exh. G ("Ballard-Bustamante Dep.

6    Tr. Vol. 2"), at 268:7–268:24; *id.* at Exh. 64.  On October 21, 2018, the CMC canceled Alfa's

7    Maintenance Contracts and blacklisted Alfa from contracting with the CMC for three years.  Al

8    Mumin Decl. ¶ 15.  Three days later, the CMC disqualified from consideration Alfa's bid for the

9    2018 RFP on the grounds that it was blacklisted from contracting with the CMC.  *Id.* ¶ 20.  On

10   November 1, 2018, the CMC awarded the 2018 RFP project to AZG (which had submitted a

11   proposal naming TCI as its partner).  *Id.* ¶ 21; Ballard-Bustamante Decl. ¶ 14.

12          Alfa filed a formal objection regarding the bid award with the CMC, which rejected the

13   objection.  *See* Ulmer Decl., Exh. E ("March 2023 Gorpinich Dep. Tr."), 96:2–13.  On November

14   26, 2018, Alfa then filed a lawsuit in Iraq against the CMC, *id.* at 96:19–23, in which it alleged the

15   2018 RFP bid award had involved corruption, bribery, conspiracy, and collusion between TCI and

16   AZG, *see id.* at Exh. F ("Al Mumin Dep. Tr."), at 29:17–21, 31:22–24.  The Iraqi court ruled

17   against Alfa on July 31, 2021.  *Id.* at 31:9–21; *see* Decl. of Gregory C. Ulmer re Translations

18   ("Ulmer Transl. Decl."), ECF No. 96-1, Exh. 97, at 5–8.  Alfa appealed to Iraq's highest court and

19   lost.  Al Mumin Dep. Tr., at 32:19–21, 34:8–16, 35:13–36:14; Ulmer Transl. Decl., Exh. 98, at 3–

20   4.  Both decisions briefly acknowledged Alfa's collusion allegations, but held that Alfa was

21   properly disqualified because TCI had not authorized its bid.  *See* Ulmer Transl. Decl., Exh. 97, at

22   5–7; *id.* at Exh. 98, at 3–4.

23          **F.      United States Action**

24          Alfa filed this suit on February 2, 2021.  ECF No. 1.  TCI answered on February 26, 2021.

25   In February 2023, the Court granted Alfa's and TCI's motions to file an amended complaint and

26   amended answer, respectively.  ECF Nos. 66, 67.  Alfa filed an amended complaint on February

27   27, 2023, and TCI filed its amended answer on March 1, 2023.  ECF Nos. 68, 71.  TCI filed the

28   instant Motion on May 4, 2023.  Following full briefing, the Court heard oral argument on July 27,

1    2023.

2    **II.    EVIDENTIARY OBJECTIONS**

3         Alfa objects to the following evidence attached to TCI's Motion:  (1) Ballard-Bustamante

4    Decl. ¶¶ 9–11, 14; (2) Ballard-Bustamante Dep. Tr. Vol. 1, at 35:17-36:1; 38:8-18; 39:14-18;

5    41:9-41:20; (3) Ulmer Decl., Exhs. B-8, B-9, B-10; and (4) Ulmer Decl., Exhs. 22–25, 29, 30, 88,

6    93.  Opp'n 25.  TCI objects to the following evidence attached to Alfa's Opposition: (1) Owens

7    Decl., Exhs. 10, 26, 49; (2) Al Mumin Decl. ¶¶ 15–16, ¶ 22 at lines 13–16; and (3) Decl. of Haider

8    Ala Hamoudi ("Hamoudi Decl.") ¶¶ 16–60, 62–65, Exh. 73, ECF No. 86-3.

9         The Court's analysis relies only on the following subset of the evidence to which the parties

10   have objected:  (1) Ulmer Decl., Exh. B-10; (3) Owens Decl., Exh. 49; (4) Al Mumin Decl. ¶ 15; and

11   (5) Hamoudi Decl. ¶¶ 17, 37–38, 50–59.  The Court overrules Alfa's objection to Exhibit B-10 as

12   inadmissible hearsay, *see* Opp'n 25, because the document is not offered to prove the truth of the

13   matter, but rather what TCI stated.  *See* Fed. R. Evid. 801(c)(2).  The Court overrules TCI's objection

14   to Exhibit 49 as inadmissible hearsay and parol evidence, *see* Reply 15, because the document is used

15   not for its truth but to indicate the speaker's state of mind, *see id.* at 801(c)(2), 803(3), and because

16   parol evidence is admissible as discussed in the order, *see infra*, at Part IV(B)(2)(a).  The Court

17   overrules TCI's objection that Paragraph 15 of the Al Mumin Declaration contains legal conclusions

18   and lacks foundation, *see* Reply 15, because the legal conclusion is not cited in this order and the

19   witness lays a foundation.  *See* Al Mumin Decl. ¶ 15 ("The Maintenance Contracts were not

20   terminable at will and the CMC's cancellation was not permissible under their terms."; "I was

21   involved in Alfa's response to the CMC's cancellation letter.").  Lastly, the Court overrules TCI's

22   objections to the Hamoudi Declaration as irrelevant (all paragraphs) and improperly applying law to

23   facts (Paragraph 51), *see* Reply 15, because it finds that the information is relevant based on the

24   Court's analysis of the legal standard for claim and issue preclusion, *see infra*, at Part IV(A)(1), and

25   the only sentence in Paragraph 51 applying the law to the present facts is not at issue in this order.

26        The Court overrules all other objections as moot because they are not at issue in this order.

27   **III.    LEGAL STANDARD**

28        Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary

United States District Court
Northern District of California

6

1    judgment is appropriate if the evidence and all reasonable inferences in the light most favorable to

2    the nonmoving party "show that there is no genuine issue as to any material fact and that the

3    moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317,

4    322 (1986).  The current version of Rule 56 authorizes a court to grant "partial summary

5    judgment" to dispose of less than the entire case and even just portions of a claim or defense.  *See*

6    Fed. R. Civ. P. advisory committee's note, 2010 amendments; *Ochoa v. McDonald's Corp.*, 133 F.

7    Supp. 3d 1228, 1232 (N.D. Cal. 2015).  As such, a court can, "when warranted, selectively fillet a

8    claim or defense without dismissing it entirely."  *Id.*

9           The moving party bears the initial burden of "either produc[ing] evidence negating an

10   essential element of the nonmoving party's claim or defense or show[ing] that the nonmoving

11   party does not have enough evidence of an essential element to carry its ultimate burden of

12   persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th

13   Cir. 2000).  If the moving party makes such a showing, the burden then shifts to the nonmoving

14   party to produce evidence supporting its claims or defenses.  *Id.* at 1103.  In judging evidence at

15   the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but

16   simply determines whether there is a genuine factual issue for trial."  *House v. Bell*, 547 U.S. 518,

17   559–60 (2006).  A fact is "material" if it "might affect the outcome of the suit under the governing

18   law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable

19   trier of fact to decide in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

20   242, 248 (1986).  Summary judgment must be denied if "a fair-minded jury could return a verdict

21   for the [non-moving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

## IV.    DISCUSSION

23          Alfa brings claims for (1) breach of contract; (2) breach of the implied covenant of good

24   faith and fair dealing; (3) tortious interference with prospective economic advantage; (4) aiding

25   and abetting tortious interference with prospective economic advantage; (5) negligent interference

26   with prospective economic advantage; (6) tortious interference with contract; and (7) aiding and

27   abetting tortious interference with contract. Am. Compl. ¶¶ 44–101.  TCI seeks summary

28   judgment on all seven claims.  Mot. 1.  It argues that the Territory Agreement did not impose

United States District Court
Northern District of California

1    exclusivity obligations on TCI; that Alfa's claims are barred by claim and issue preclusion; that

2    there is no evidence of any unlawful influence or causation related to the CMC's disqualification

3    of Alfa from the 2018 RFP; that Alfa cannot prove the essential elements of any of its interference

4    claims; and that Alfa's damages are speculative.  *See id.* at 2; 7–25.  The Court addresses the

5    preclusion issue first, and then evaluates the others in turn.

6            **A.    Claim and Issue Preclusion**

7            TCI argues that Alfa's suit is barred under both claim and issue preclusion because (1)

8    Alfa's claims in the instant action are based on its allegations that TCI was involved in acts of

9    bribery and improper collusion that led to Alfa's disqualification from CMC contracts and AZG's

10   receipt of the 2018 RFP award, and (2) Alfa's lawsuit against the CMC in Iraq was grounded in

11   the same alleged harms, so that Alfa's loss in the Iraqi courts prevents it from bringing claims

12   based on the same alleged wrongdoing, or from proving that Alfa would have won the 2018 RFP

13   but for the alleged bribery and collusion.  *See* Mot. 10–13.  Alfa counters that Iraqi judgments are

14   not given preclusive effect under Iraqi law; that neither claim nor issue preclusion applies because

15   the claims and issues in the Iraqi action were "fundamentally different" from those asserted in the

16   instant case; and that the Iraqi litigation did not involve the same parties.  Opp'n 11–14.

17           At the outset, the parties dispute which jurisdiction's law applies.  That is, although both

18   parties agree that the Court must look to California law to evaluate preclusion, TCI argues that

19   only California law applies, while Alfa contends that California law itself requires the application

20   of Iraqi law to evaluate the preclusive effect of the Iraqi orders.  *See* Mot. 10; Opp'n 11–14; Reply

21   5–6; *see also Jacobs v. CBS Broad., Inc.*, 291 F.3d 1173, 1177 (9th Cir. 2002) (noting the forum

22   state's law controls claim and issue preclusion in a diversity case).  The question, then, is that of

23   what California law requires to determine the preclusive effect of an international adjudication.

24           **1.    Legal Framework**

25           "To determine if a party is precluded from relitigating an issue decided in a foreign

26   judgment, courts engage in a two-step analysis: first deciding whether to recognize the foreign

27   judgment, and second determining which jurisdiction's preclusion law to apply."  *UM Corp. v.*

28   *Tsuburaya Prods. Co., Ltd.*, No. CV1503764, 2017 WL 5983762, at *4 (C.D. Cal. Sept. 8, 2017)

United States District Court
Northern District of California

8

1    (citations omitted), *aff'd*, 793 F. App'x 511 (9th Cir. 2019); *see also Ohno v. Yasuma*, 723 F.3d

2    984, 987 n2 (9th Cir. 2013) ("Recognition of a judgment is a prerequisite to its enforcement.").

3    As stated by the California Supreme Court, "California courts must recognize a foreign judgment,

4    regardless of whether it has been appealed or is subject to appeal, so long as the judgment is final,

5    conclusive, and enforceable in the country where it was rendered." *Manco Contracting Co.*

6    *(W.L.L.) v. Bezdikian*, 45 Cal. 4th 192, 201 (2008); *see also Walia v. Aegis Ctr. Point Devs. Priv.*

7    *Ltd.*, No. 12-cv-4660, 2014 WL 296003, at *2 (N.D. Cal. Jan. 27, 2014) (citing same).  California

8    law therefore requires the finality, conclusiveness, and enforceability of a foreign judgment to be

9    evaluated under the foreign country's law to determine cognizability.  *See id.*  Defenses to

10   recognition, however, are assessed under California law.  *See Pentz v. Kuppinger*, 31 Cal. App. 3d

11   590, 597 (1973) (noting foreign judgment need not be recognized if repugnant to California public

12   policy).

13          As explained in the cases cited by TCI, *see* Reply 5–6, if a court recognizes a foreign

14   judgment, it must then determine whether the judgment is accorded preclusive effect or is

15   otherwise enforceable.  *See UM Corp.*, 2017 WL 5983762, at *4.  "[E]nforceability of judgments

16   of courts of other countries is generally governed by the law of the state in which enforcement is

17   sought."  *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1221 (9th Cir. 2022) (citations omitted).

18   Although the case law is not entirely consistent, it appears that under California law an

19   international judgment will not have a preclusive effect in California unless it would also have a

20   preclusive effect under the foreign country's laws.  *See Brinker v. Super. Ct.*, 235 Cal. App. 3d

21   1296, 1300 (1991) ("Under California law, both the validity and effect of a foreign judgment are

22   governed by the laws of the state in which it is rendered.") (citation omitted); *see Folex Golf*

23   *Indus., Inc. v. O-Ta Precision Indus. Co., Ltd.*, 603 F. App'x 576, 578–79 (9th Cir. 2015) (noting

24   in dicta that California courts would not find Chinese judgment preclusive because Chinese law

25   does not recognize issue preclusion); *Lee v. Lee*, No. LA CV19-08814, 2022 WL 18278434, at *7

26   (C.D. Cal. Dec. 1, 2022) (finding under California law that issue preclusion did not apply to

27   Korean judgment because Korean law does not recognize it); *but see Walia*, 2014 WL 296003, at

28   *2 ("Collateral estoppel applies to foreign judgments so long as the parties in the prior action were

United States District Court
Northern District of California

9

1    afforded due process rights.") (citing *Hilton v. Guyot*, 159 U.S. 113, 204–05 (1895)).

2          In any event, if a foreign judgment may have a preclusive effect, California's preclusion

3    analysis then applies—which, as explained by the cases cited in TCI's reply, *see* Reply 5–6, itself

4    requires application of foreign law to determine the various elements of the doctrines.  *See, e.g.*,

5    *De Fontbrune*, 39 F.4th at 1227 (noting that California law required determination of subject

6    matter jurisdiction "with reference to foreign law" when brought as defense to recognition of

7    foreign judgment, and applying French law); *Walia*, 2014 WL 296003, at *6 (assessing whether

8    judgment was on the merits based on Indian law).  The Court notes that the analysis for

9    international judgments is somewhat different than that for *federal* judgments because the

10   Supreme Court has explicitly held that state law governs the claim-preclusive effect of a prior

11   federal judgment.  *See Burdette v. Carrier Corp.*, 158 Cal. App. 4th 1668, 1681–82 (2008) (citing

12   *Semtek Intern. Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 499 (2001)); *but see id.* at 1688–91

13   (analyzing issue-preclusive effect under federal preclusion law).

14              2.      **Application**

15         With these principles in mind, the Court notes that TCI has not provided the Court with

16   any evidence showing that the Iraqi orders are even recognizable under California law, *i.e.*, that

17   "[each] judgment is final, conclusive, and enforceable" in Iraq.  *See Manco*, 45 Cal. 4th at 201.

18   The only evidence submitted by TCI regarding the Iraqi orders are the orders themselves—for

19   which TCI did not submit certified translations until so ordered by the Court after oral argument—

20   and deposition testimony of Alfa's 30(b)(6) witness, in which the witness discusses the orders but

21   does not testify regarding Iraqi law.  *See* Ulmer Decl., Exhs. 97–98; Not. of Certified Transls.,

22   ECF No. 96; Al Mumin Dep. Tr. 27:6–34:23.  Accordingly, TCI has not made a showing that the

23   Iraqi judgments are even recognizable under California law, *i.e.*, that they are "final, conclusive,

24   and enforceable" in Iraq.  *See Manco*, 45 Cal. 4th at 201.  In fact, Alfa has submitted expert

25   testimony indicating that Iraqi law does not recognize preclusion, but rather treats a prior

26   judgment as something akin to an irrebuttable evidentiary showing.  *See* Hamoudi Decl. ¶ 17.

27   There is nothing before the Court that contradicts this testimony.  *See generally* Reply.  As Alfa

28   points out, *see* Opp'n 12, courts in the United States recognize an important theoretical difference

between evidentiary presumptions and the equitable doctrines of claim and issue preclusion. *See, e.g.*, *Lee*, 2022 WL 18278434, at *8 ("Although Korean law may call for deference to factual findings in prior cases, there has not been a showing that it applies or includes a doctrine equivalent to issue preclusion as defined under California law."). However, based on the material presented by the parties, the Court lacks the expertise to determine whether the stated effect under Iraqi law of an earlier court judgment—which is "treat[ed] . . . as a form of evidence that is final and cannot be challenged by any other evidence," Hamoudi Decl. ¶ 17—makes the judgment recognizable under California law. *See Manco*, 45 Cal. 4th at 201. Due to a failure of proof by TCI and the inconclusive nature of the expert opinion submitted by Alfa, the Court finds that TCI has not met its burden and thus, the Motion is denied on the first prong of the analysis—whether the Iraqi orders are recognizable. However, the Court also has considered whether the Iraqi orders would preclude these claims under the second prong of the analysis if they were recognizable. Applying California's claim and issue preclusion analyses to the orders, as discussed below, the Court finds that TCI has not made the requisite showing for either claim or issue preclusion.

Under California law, claim preclusion "prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 824 (2015) (quoting *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 896 (2002)). The three elements of claim preclusion are "(1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit." *Id.* (citations omitted). Issue preclusion "prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action." *Id.* (citing *Mycogen*, 28 Cal. 4th at 896). The four elements of issue preclusion are "(1) [] final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." *Id.* (citations omitted).

Importantly, TCI's arguments going to show the "same cause of action" (the first element of claim preclusion) and an "identical issue actually litigated and necessarily decided" (the second and third elements of issue preclusion) depend on its position that the Iraqi courts found that the CMC did not accept a bribe from or otherwise improperly collude with AZG or TCI when the

1    CMC disqualified Alfa from future CMC contracts and awarded the 2018 RFP to AZG and TCI.

2    *See* Mot. 12 ("Alfa is asserting the same cause of action in this lawsuit which it asserted in the Iraq

3    litigation . . . [which] sought to invalidate the CMC's award to AZG based on allegations of

4    wrongdoing, collusion, bribery, and unlawful influence by the CMC, AZG, and TCI."); *see id.*

5    ("[I]ssue preclusion certainly applies . . . .  Because Alfa is barred from relitigating the

6    appropriateness of the CMC's disqualification of Alfa in the 2018 tender, Alfa cannot prove it

7    would have won the 2018 tender but-for the alleged bribe and therefore Alfa's claims necessarily

8    fail for lack of causation.").  As noted above, *see supra*, at Part IV(A)(1), the cases cited by TCI

9    indicate that California law requires application of foreign law to determine the various elements

10   of the preclusion doctrines.  *See* Reply 5–6; *see also De Fontbrune*, 39 F.4th at 1227 (applying

11   French law to questions related to recognition and enforceability of French judgment); *Walia*,

12   2014 WL 296003, at *6 (applying Indian law to question of whether Indian judgment was on the

13   merits).  The other two cases cited by TCI in support of applying only California law are

14   inapposite.  *See Burdette*, 158 Cal. App. 4th at 1688–91 (applying state law to federal judgment

15   for claim preclusion analysis following Supreme Court holding that state law governs the claim-

16   preclusive effect of a prior *federal* judgment, but analyzing issue-preclusive effect under federal

17   preclusion law); *Pentz*, 31 Cal. App. 3d at 597 (refusing to recognize foreign judgment after

18   finding recognition would be repugnant to California public policy related to alimony payments).

19          The Court therefore reviews the certified translations of the Iraqi orders to determine

20   whether TCI has established the elements for claim or issue preclusion under California law, and

21   concludes that neither decision evaluated the issue of whether TCI or any other entity bribed the

22   CMC.  *See* Ulmer Transl. Decl., Exhs. 97–98.  Although the Iraqi court orders both acknowledge

23   Alfa's allegations of bribery and wrongdoing, they hold only that Alfa's bid for the 2018 RFP was

24   properly excluded from consideration for lack of compliance with a bidding requirement.  *See*

25   ECF No. 96-1, at 11, 18.  Thus, even if the Court were to assume that the Iraqi orders are

26   recognizable under California, TCI's preclusion arguments still fail because it is unable to

27   establish that the Iraqi orders analyzed the question of whether a bribe passed from AZG or TCI to

28   the CMC.  TCI therefore has not shown that Alfa is asserting either the same cause of action, as

United States District Court
Northern District of California

1    required to meet the first element of claim preclusion, or an identical issue actually litigated and

2    necessarily decided, as required to meet the second and third elements of issue preclusion.  *See*

3    Mot. 12; *DKN Holdings*, 61 Cal. 4th at 824.

4         The Court thus cannot conclude based on the record before it that Alfa's claims are

5    precluded, and it will deny TCI's motion for summary judgment on this ground.

6         **B.    Existence of Exclusivity Obligations in the Territory Agreement**

7         TCI argues that each of Alfa's claims "is based on Alfa's allegation that the [Territory]

8    Agreement imposes an exclusivity obligation on TCI," and that all of Alfa's claims therefore fail

9    as a matter of law because the Territory Agreement "did not impose any exclusivity obligations on

10   TCI."  Mot. 7; *see id.* at 7–10.  Alfa counters that the Territory Agreement "unambiguously

11   required TCI to exclusively work with Alfa on a bid" for the CMC's SMMS project under the

12   express terms of the agreement."  Opp'n 8; *see id.* at 8–11.  The parties agree that California law

13   applies to the interpretation of the Territory Agreement.  *See* Mot. 8; Opp'n 8; *see also* Territory

14   Agr. App'x 2 ¶ 22.1 ("This Agreement shall be interpreted and governed by the laws of the State

15   of California.").

16        **1.    Legal Framework**

17        "Contract interpretation is a question of law to be determined by the Court."  *FiTeq Inc v.*

18   *Venture Corp.*, No. 13-cv-1946, 2015 WL 3987912, at *3 (N.D. Cal. June 30, 2015) (citing *TRB*

19   *Invs., Inc. v. Fireman's Fund Ins. Co.*, 40 Cal. 4th 19, 27 (2006)).  "If the contractual language is

20   clear and explicit, it governs."  *County of San Diego v. Ace Prop & Cas. Ins. Co.*, 37 Cal.4th 406,

21   415 (2005) (quoting *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1264 (1992)).  "The

22   fundamental goal of contractual interpretation is to give effect to the mutual intention of the

23   parties."  *Id.* (quoting *Bank of the West*, 2 Cal. 4th at 1264).  Unless there is an ambiguity in the

24   language of the contract, courts are to infer the parties' intent "solely from the written provisions

25   of the contract."  *Id.* (citation omitted).  A provision is ambiguous "when it is capable of two or

26   more constructions, both of which are reasonable."  *TRB Invs., Inc.*, 40 Cal. 4th at 27 (citation

27   omitted).  However, "language in a contract must be interpreted as a whole, and in the

28   circumstances of the case, and cannot be found to be ambiguous in the abstract."  *Id.*; *see also*

United States District Court
Northern District of California

*Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 19 (1995) ("Courts will not strain to create an ambiguity where none exists.").

If the parties dispute the meaning of contract terms, the court must provisionally receive "all credible evidence concerning the parties' intentions" to determine whether there is an ambiguity.  *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010) (quoting *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1992)); *see also First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1067 (9th Cir. 2011) ("[I]t is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face.") (quoting *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998)).  "Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible."  *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1015 (9th Cir. 2012)) (internal punctuation omitted) (quoting *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006)).  Extrinsic evidence "can be admitted to explain the meaning of the contractual language at issue" even if the contract is an integrated agreement, "although it cannot be used to contradict it or offer an inconsistent meaning."  *Hot Rods, LLC v. Northrop Grumman Sys. Corp.*, 242 Cal. App. 4th 1166, 1175 (2015); *see Solaria Corp. v. GCL Sys. Integration Tech. Co., Ltd.*, No. 20-cv-07778, 2022 WL 267444, at *8 (N.D. Cal. Jan. 28, 2022) ("Moreover, extrinsic evidence may be offered 'to resolve an ambiguity,' even when the contract is an integrated agreement.") (citation omitted).  If the court subsequently decides the contract language at issue is in fact "reasonably susceptible" to multiple interpretations—*i.e.*, that there is an ambiguity—it admits the parol evidence and uses such evidence to aid in its interpretation of the contract.  *F.B.T. Prods.*, 621 F.3d at 963.

### 2.    Application

TCI and Alfa dispute whether the Territory Agreement required TCI to exclusively work with Alfa on any bid for the CMC's SMMS project in Iraq, including a bid in response to the 2018 RFP.  *See* Mot. 7 ("Alfa's claims fail on the exclusivity issue because it is contrary to the actual language in the Agreement which did not impose any exclusivity obligations on TCI and was

1    limited to the 2016 tender."); Opp'n 8 ("Summary judgment should be denied because the

2    Agreement unambiguously required TCI to exclusively work with Alfa on a bid for the CMC

3    Project in Iraq.").   The Court first considers and resolves any ambiguity with respect to

4    exclusivity, and then with respect to whether the Territory Agreement covered the 2018 RFP bid.

5                          a.       **Exclusivity Obligations**

6            TCI argues that the Territory Agreement, though titled an "Exclusive Agency Agreement,"

7    is unambiguously a representation agreement that only imposes exclusivity obligations upon Alfa.

8    *See* Mot. 8–9.  For support, TCI emphasizes that the Territory Agreement permits TCI to "locate

9    and deal directly with prospective or existing customers through its own company personnel or

10   other representatives," *id.* at App'x 2 § 4.4, but prohibits Alfa from "becom[ing] associated in any

11   capacity with any person, firm or corporation competing with or setting up to compete with [TCI]

12   in [Iraq]," *id.* at App'x 2 § 6.1.  However, as Alfa notes, *see* Opp'n 8, the main text of the

13   Territory Agreement provides that the "Agreement shall be exclusive within [Iraq]."  Territory

14   Agr. ¶ 4.1.  Each party argues that the other's interpretation would render its chosen provision

15   surplusage, which is a disfavored outcome.  *See* Mot. 9; Opp'n 9; *see also, e.g.*, *In re Tobacco*

16   *Cases I*, 186 Cal. App. 4th 42, 49 (2010) (citation omitted).  TCI additionally contends that the

17   two provisions are not inconsistent because the exclusivity referenced in § 4.1 of the Territory

18   Agreement relates only to Alfa.  Reply 2.

19           The exclusivity obligations on Alfa contained in § 6 of Appendix 2 to the Territory

20   Agreement are not at issue here; the only disputed interpretation is whether the Territory

21   Agreement imposed exclusivity obligations on TCI.  TCI rests entirely on § 4.4 of Appendix 2 to

22   argue that it was not subject to any exclusivity argument.  *See* Mot. 7–10; Reply 1–3.  But this

23   provision, read in context with the remainder of the Territory Agreement, *see TRB Invs., Inc.*, 40

24   Cal. 4th at 27, does not unambiguously establish that TCI was free to work to secure a project bid

25   with a company other than Alfa.  Importantly, § 4.4 of Appendix 2 makes no mention of the

26   "Project" that is the subject of the agreement.  *Compare* Territory Agr. App'x 2 § 4.4, *with, e.g.*,

27   Territory Agr. § 1.1 ("[TCI] seeks [Alfa's] services in securing the award of the Project as defined

28   in Appendix 1"), *id.* at App'x 1 § 2(a) ("The Project consist of . . . the sales opportunity . . . related

United States District Court
Northern District of California

15

and specific to the Project(s) described in Table-1 below."), *id.* at App'x 1, Table T-1 (describing "TCI Project No. 61930").  Instead, § 4.4 of Appendix 2 merely exempts TCI from obligations other than those "specifically provided in this Agreement," such as "locat[ing] and deal[ing] directly with prospective or existing customers through its own company personnel or other representatives"—without reference to the Project.  By contrast, § 4.1 of the main Territory Agreement provides that the "Agreement shall be exclusive *within the Project Country*."  Territory Agr. § 4.1 (emphasis added).  Accordingly, the contract is ambiguous as to exclusivity because it can be reasonably interpreted to impose mutual exclusivity obligations on the parties, *see id.*, and to make explicit that the contract does not impose obligations on TCI where the "Project" is not at issue.  *See TRB Invs., Inc.*, 40 Cal. 4th at 27.

Because the contract is ambiguous, extrinsic evidence is admissible to aid in the Court's efforts to "give effect to the mutual intention of the parties" with regard to exclusivity.  *County of San Diego*, 37 Cal.4th at 415 (citation omitted).  Alfa is the only party to submit such extrinsic evidence (although TCI presents evidence with respect to the scope of the "Project," as discussed below).  *See* Mot. 9–10; Opp'n 9–10; Reply 1–5.  That evidence shows that an earlier draft of the Territory Agreement had contained a term providing that "[TCI] retains the right, either individually or through additional representatives, to pursue any opportunity in the Project Country and elsewhere," Owens Decl., Exh. 49, at App'x 3 § 7(d); that Alfa's January 24, 2016 summary of comments on the draft stated, with respect to the foregoing provision, "[I]t contradicts with nature of the Exclusive Agreement.  Can this be removed?," *id.* at Comments Page: 14; and that the final version of the Territory Agreement omitted that provision, *see* Territory Agr. App'x 3 § 7.  TCI's only response to this evidence is to state that it cannot be used to "contradict or alter the Agreement," which contains an integration clause, and that the use of the evidence would contradict the contract with respect to § 4.4 of Appendix 2.  Reply 4–5.  This position is not persuasive.  Extrinsic evidence may be used to explain ambiguous language even in an integrated contract as long as it does not contradict the contract language.  *See Hot Rods, LLC*, 242 Cal. App. 4th at 1175.  And as noted above, § 4.4 of Appendix 2 does not unambiguously provide that TCI was free of exclusivity obligations with respect to the "Project," so that extrinsic evidence

1    indicating the parties intended for both parties to be subject to exclusivity obligations regarding

2    the "Project" does not contradict or alter any term in the Territory Agreement.

3         For the foregoing reasons, the Court concludes that summary judgment is inappropriate on

4    the issue of exclusivity.  Where the language of a contract is sufficiently "uncertain in its meaning

5    [so as] to require an examination into extrinsic circumstances to ascertain the intent of the parties .

6    . . it is the primary duty of the trial court to construe the language after a full opportunity [is]

7    afforded to all parties in the case to produce evidence of facts, circumstances and conditions

8    surrounding its effect and the conduct of the parties relating thereto."  *Loree v. Robert F. Driver*

9    *Co.*, 87 Cal. App. 3d 1032, 1040 (1978).

10                    **b.    Scope of Work Covered by Territory Agreement**

11        TCI also contends that the scope of the Territory Agreement was limited to "TCI Project

12   No. 61930," *see* Territory Agr. § 1.1; *id.* at App'x 1, Table-1, and that TCI Project No. 61390

13   related only to the 2016 RFP, so that there was no exclusivity as to the 2018 RFP.  Mot. 9–10.

14   Alfa counters that the Territory Agreement makes no reference to the 2016 RFP or any other

15   specific bid, and that TCI's internal project number could be changed at will.  Opp'n 9 (citing

16   Owens Decl., Exh. E ("Berger Dep. Tr.") 60:25–61:15).  Under Alfa's proposed interpretation, the

17   term "Project" refers to a bid to the CMC "related to" the substance of the 2016 RFP, which would

18   encompass the 2018 RFP.  *See* Opp'n 2.  Because the parties dispute the meaning of the term

19   "Project" in the Territory Agreement, the Court both reviews the contract language and

20   provisionally reviews the extrinsic evidence and also .  *See F.B.T. Prods., LLC*, 621 F.3d at 963.

21        The Territory Agreement defines the "Project" to "consist[s] of the marketing and pursuit

22   of the sales opportunity for the Products related and specific to the Project[] described in Table-1

23   below."  Territory Agr. App'x 1 § 2(a).  The relevant table provides a "Project Description" of:

24   "TCI Project No. 61930 – The Project consists of the provision of 1 x RFMS + 2 x ARFMS + 4 x

25   RDFS + 3 x MMS-1 + 2 x MMS-2 + 3 TRMS + 5 PME + 1 Control Center + Spares and Training

26   for the [CMC]."  *Id.* at App'x 1, Table-1.  As both parties acknowledge, the 2016 RFP was put

27   forth by the CMC in 2016, and then canceled by the end of the year.  *See* Mot. 3; Opp'n 2;

28   Ballard-Bustamante Decl. ¶ 7.  Prior to the cancelation, the parties entered into a Teaming

United States District Court
Northern District of California

1    Agreement setting forth the "general terms for an exclusive working relationship . . . to prepare a

2    proposal for submission to the CMC [for the 2016 RFP]," which expired by September 9, 2017.

3    Teaming Agr. at 1; *see also* Owens Decl., Exh. 39.  TCI argues that the Territory Agreement was

4    "supported by the [] Teaming Agreement," so that the expiration of the Teaming Agreement by

5    September 9, 2017 further supports the interpretation that the Territory Agreement did not apply to

6    the 2018 RFP.  *See* Mot. 9.

7         The extrinsic evidence to which TCI points does not support its interpretation that the

8    Territory Agreement was limited to the 2016 RFP.  First, it bears noting that the Territory

9    Agreement was signed in February 2017, after the CMC canceled the 2016 RFP.  *See* Territory

10   Agr. 1.  It would be absurd to interpret the contract to cover only a sales opportunity that had

11   already passed, and absurd interpretations are not favored.  *See* Cal. Civ. Code § 1638 ("The

12   language of a contract is to govern its interpretation, if the language is clear and explicit, and does

13   not involve an absurdity.").  Additionally, the Territory Agreement provided that "[u]nless

14   terminated earlier in accordance with Article 7, this Agreement shall remain valid until 31

15   December 2019."  Territory Agr. § 2.2.  There is no Article 7 to the main agreement, and Article 7

16   of Appendix 2, titled "Termination," does not include a termination provision based on the

17   expiration of the Teaming Agreement.  *See id.* at App'x 2 § 7.  TCI's other evidence indicates that

18   Alfa was in fact aware that TCI was using internal project number 61930 to describe the work TCI

19   had done for the 2016 RFP.  *See, e.g.*, Reply 3; Ulmer Decl., Exh. 19.  This evidence does not

20   counter the reasonableness of the interpretation that TCI continued to use the project number after

21   the CMC's cancelation of the 2016 RFP to reference a similar project.  Further, at least one of the

22   exhibits discussed by Alfa during oral argument indicates that TCI did treat its work for the 2018

23   RFP as a continuation of its work for the 2016 RFP.  *See* Owens Decl., Exh. 59 (internal TCI

24   email regarding 2018 RFP describing project by stating, "[t]his project was tendered in 2016 . . .

25   however was not awarded").

26        Because the Territory Agreement does not unambiguously refer only to the 2016 RFP—

27   which was canceled before the parties executed the contract—summary judgment is not

28   appropriate on this argument.  *See Loree*, 87 Cal. App. 3d at 1040.

United States District Court
Northern District of California

United States District Court
Northern District of California

**C.      Unlawful Influence and Causation**

TCI additionally argues that each of Alfa's claims requires Alfa to show both unlawful influence and causation, and that the claims all fail because there is no evidence that (1) TCI engaged in or assisted AZG with exerting unlawful influence on the CMC or (2) the alleged bribe or unlawful influence caused the CMC to award the contract to AZG or caused the CMC to disqualify Alfa's bid for the 2018 RFP.  Mot. 13–17.  Alfa counters that there is substantial evidence of both unlawful influence, in that TCI was aware of and tacitly approved of AZG's bribing of the CMC, and that TCI received advance confidential information about the 2018 RFP in return, and causation, based on evidence that TCI discussed removing Alfa from the competition for the 2018 RFP and that the timing of the CMC's actions indicate its blacklisting of Alfa was in response to TCI and AZG's unlawful influence.  Opp'n 14–20.

**1.      Unlawful Influence**

TCI repeatedly contends that Alfa has "no evidence regarding the who, what, where, when, or how of the alleged bribe."  Mot. 14, Reply 9 (emphasis omitted).  Alfa's evidence indicates that an internal TCI email discussed AZG's "heav[y]" markup of the "government services" cost for the 2018 RFP bid, noting that "[h]ad [TCI] not allocated these 'costs' our chances of winning would be lower," and that AZG "need[ed] to cover the lobbying needed to make this win."  Owens Decl., Exh. 60.  In response to a call regarding this email, TCI's then-VP of Contracts stated that "the signed Teaming Agreement contains the usual FCPA provisions, and [TCI] need[ed] to communicate to [AZG] that we expect them to comply with the obligations that they have undertaken in that agreement."  *Id.*  The record further shows that an individual associated with AZG provided TCI with advance, "sensitive" information from a CMC source in July 2018, regarding an RFP "still in development" that could be "modified," and who stated in response to TCI's "main concern" about an antenna requirement that "this was not going to be a problem to remove."  Owens Decl., Exh. 59; *see* Ballard-Bustamante Dep. Tr. Vol. 2 150:16–21.  Additionally, after the 2018 RFP bids were submitted, the same AZG-associated individual informed TCI of all of the bid amounts before the CMC, which TCI described as "advance information" necessitating that TCI "[w]ait for the official bid opening results from the CMC."

19

1    Owens Decl., Exh. 64.  Based on this evidence, a jury could reasonably infer that TCI's receipt of

2    advance information from the CMC, via AZG, was the result of a bribe or other improper conduct

3    by AZG and that TCI tacitly approved of AZG's conduct.  *See* Owens Decl., Exh. 60 ("[AZG]

4    need[s] to cover the lobbying needed to make this win.  This is Iraq.").  Accordingly, the Court

5    finds that Alfa has shown the existence of a genuine dispute of material fact as to TCI's

6    engagement in or assistance with unlawful influence upon the CMC.

7              **2.    Causation**

8              **a.    Which Claims Are at Issue**

9         TCI summarily asserts that each of Alfa's claims—namely, (1) breach of contract; (2)

10   breach of the implied covenant of good faith and fair dealing; (3) tortious interference with

11   prospective economic advantage; (4) aiding and abetting tortious interference with prospective

12   economic advantage; (5) negligent interference with prospective economic advantage; (6) tortious

13   interference with contract; and (7) aiding and abetting tortious interference with contract—

14   requires a showing of causation.  *See* Mot. 13 ("TCI is entitled to summary judgment on all of

15   Alfa's claims because there is no evidence of unlawful influence or causation."); *id.* at 15 ("Alfa's

16   claims fail because Alfa has no evidence of causation.").  Alfa does not argue that any of its claims

17   survive a finding that it has not shown that unlawful influence or improper conduct caused the

18   CMC to disqualify or blacklist Alfa; it only argues that it has sufficiently shown causation.  *See*

19   Opp'n 17–20.  The Court notes, however, that Alfa's claim for breach of contract (and the

20   accompanying claim for breach of the implied covenant of good faith and fair dealing) alleges two

21   breaches, and that the breaches rely on different theories of causation.  *See* Am. Compl. ¶ 47

22   ("TCI materially breached the Exclusive Agency Agreement by (1) partnering with [AZG] and not

23   Alfa to submit a bid for the SMMS Project, in violation of its exclusivity provision, and (2) by

24   violating its ethical and legal obligations in securing the SMMS Project, including by violating or

25   assisting [AZG] in a violation of the FCPA."); *id.* ¶ 53 ("Not only did TCI consciously and

26   deliberately breach the exclusivity arrangement, but TCI also consciously, deliberately, and

27   unfairly frustrated the agreed common purpose of the [Territory] Agreement.").

28         TCI's causation argument—that "[t]here is no evidence that the alleged bribe or unlawful

1    influence caused the CMC to award the contract to AZG or caused the CMC to disqualify Alfa's

2    bid," Mot. 15—concerns the existence of harm caused by the alleged bribe, but does not address

3    any harm caused by the breach of the alleged exclusivity requirement.  The Court's analysis of

4    TCI's causation argument therefore applies to all of Alfa's interference-based tort claims, as well

5    as Alfa's claims for breach of contract and breach of the implied covenant of good faith and fair

6    dealing, to the extent the latter two claims rest on TCI's alleged breach of the Territory Agreement

7    by "violating its ethical and legal obligations in securing the SMMS Project, including by

8    violating or assisting [AZG] in a violation of the FCPA."  Am. Compl. ¶ 47.  The analysis is not

9    applicable to Alfa's two contract claims to the extent those claims rest on TCI's alleged breach of

10   exclusivity obligations under the Territory Agreement.

11                    **b.        Whether There Exists a Genuine Dispute of Material Fact**

12           TCI relies heavily on the Ninth Circuit's opinion in *Rotec Industries, Inc. v. Mitsubishi*

13   *Corp.*, 348 F.3d 1116 (9th Cir. 2003) to argue that Alfa cannot establish a causal connection

14   between the alleged improper conduct and the CMC's failure to award Alfa the contract based on

15   its 2018 RFP bid.  *See* Mot. 15–17.  In *Rotec*, the Ninth Circuit assumed that the defendant

16   engaged in improper means to interfere with the plaintiff's economic relationship with a third

17   party and secure a contract, including by offering a job to a member of a sub-committee of the

18   contracting entity.  *See Rotec*, 348 F.3d at 1122.  However, the court affirmed the district court's

19   grant of summary judgment for the defendant, holding that "too many inferences need to be drawn

20   to establish a connection between that improper conduct and [the plaintiff's] ultimate failure to

21   secure the two contracts won by defendants."  *Id.*  Specifically, the court found that the plaintiff

22   had not shown that the bribed individuals had sufficient influence to cause their committee to

23   recommend the defendant's bid, or that the bribed individuals caused the larger contracting entity

24   to award the contracts to the defendant.  *Id.* at 1122–23.  TCI argues that Alfa cannot show the

25   identities of any allegedly bribed CMC members, nor the influence those individuals had in the

26   contract award process and eventual decision.  Mot. 16–17.  Alfa concedes that it does not possess

27   details about the alleged bribe, but counters that there is ample evidence of causation because (1)

28   the CMC's two reasons for blacklisting and disqualifying Alfa were implausible and (2) the

United States District Court
Northern District of California

United States District Court
Northern District of California

timeline of events establishes that the CMC's actions were the direct result of AZG and TCI's involvement.  *See* Opp'n 17–20.

Taking the timeline argument first, Alfa's evidence does not in fact show that any improper conduct by TCI, whether independently or through AZG, caused Alfa's disqualification from the 2018 RFP or its overall blacklisting.  Rather, the evidence shows that on September 10, 2018, Alfa submitted a 2018 RFP bid to the CMC with TCI's logo, despite TCI's express statement that it did not authorize Alfa to do so.  *See* Gorpinich Decl. ¶ 11; Ulmer Decl., Exh. B-10; Owens Decl., Exh. A-5.  TCI learned of Alfa's bid that same day, and was informed by AZG that it needed to inform the CMC that Alfa's bid was not authorized by TCI and that AZG was TCI's exclusive partner.  Owens Decl., Exh. A-5.  TCI wished to "contact the CMC directly immediately [sic] and inform them only one bid is legitimate."  *Id.*  It then learned from AZG that the proper course of action was to wait for the official bid opening results before providing the CMC with documentation of TCI's exclusivity with AZG, at which point the CMC would blacklist Alfa.  *Id.*  Over the next two days, TCI continued to internally discuss the process of informing the CMC that its relationship with AZG was exclusive.  *See* Owens Decl., Exh. A-3.  Although TCI stated that providing the CMC with the documentation would "enable them to remove the threat from Alfa," *id.*, there is no indication that TCI was engaging in any improper conduct by internally discussing any communications with the CMC regarding Alfa's lack of authorization to submit a bid with TCI's logo.  *See also* Owens Decl., Exh. 65 (asking in October 2018 whether Alfa had been eliminated from the bidding process).  After the CMC blacklisted Alfa and removed its bid from consideration for the 2018 RFP, it recommended and later confirmed that the project be awarded to AZG.  Al Mumin Decl. ¶ 21.

To summarize, Alfa has not provided any evidence that TCI sought to do anything but inform the CMC that Alfa's bid was not authorized by TCI.  The CMC itself informed Alfa that Alfa's Maintenance Contracts were being canceled—and Alfa was being blacklisted—because (1) Alfa had failed to provide certain documents for the Maintenance Contracts and (2) the general manager of Alfa's Iraqi branch was involved in litigation with a private citizen.  Al Mumin Decl. ¶ 15.  The litigation at issue involved allegations of fraud against the general manager.  *Id.* ¶ 19.

1       Alfa argues that these reasons given by the CMC were implausible, and therefore pretextual,

2    because Alfa had not missed a deadline to provide the Maintenance Contract documentation and

3    the fraud allegations were neither made against Alfa nor substantiated.  Opp'n 17–18.  Alfa further

4    contends that the CMC's stated reasons did not provide it with legal grounds for blacklisting Alfa,

5    and that the CMC did not follow the required procedures for blacklisting.  *See* Hamoudi Decl. ¶¶

6    37–38, 50–59.  (TCI notes in turn that Iraq's highest court found the CMC's disqualification of

7    Alfa to have been appropriate.  Reply 11–12; *see* Ulmer Transl. Decl., Exh. 98.)

8           Based on the evidence in the record, Alfa has not created a genuine dispute of fact as to

9    whether TCI, in conjunction with AZG, caused Alfa's blacklisting, even assuming there was

10   improper conduct at some point.  A factfinder would need to infer that TCI, through AZG, bribed

11   or knew of a bribe to one or more unknown persons at the CMC; that the bribe, rather than the

12   CMC learning that Alfa's bid was unauthorized, was the motivation for the blacklisting; and that

13   the bribed persons had sufficient influence to cause the CMC to impermissibly blacklist Alfa (a

14   decision later upheld by Iraq's highest court later found proper).  Although it is true that purely

15   circumstantial evidence may create a genuine dispute of fact, Alfa's evidence requires the stacking

16   of inference upon inference, rather than inference upon evidence.  *See Rotec*, 348 F.3d at 1122–23

17   (finding plaintiff had not sufficiently drawn connection between assumed improper conduct and

18   unfavorable outcome, even where bribed individuals were known).

19          The Fifth Circuit's decision in *Waste Management of Louisiana, L.L.C. v. River Birch,*

20   *Inc.*, 920 F.3d 958, 968 (5th Cir. 2019), which Alfa cites in its brief and upon which Alfa's

21   counsel relied during oral argument, supports this conclusion.  In *Waste Management*, the plaintiff

22   provided evidence showing a mayor initially decided to permit operation of a landfill, continued to

23   stand by that decision, then shortly thereafter was reminded of the defendants' large financial

24   contributions to his reelection campaign, and lastly, three days after the reminder, announced that

25   landfill operations would not continue (as the defendants wished).  920 F.3d at 970.  This

26   evidence, which, though circumstantial, is far more concrete than Alfa's submissions, was a "close

27   call" that the Fifth Circuit held was sufficient to survive summary judgment.  *Id.*  Alfa is not

28   required to produce a "definitive 'smoking gun,'" *id.* at 968, but "the 'mere existence of a scintilla

1    of evidence in support of the [nonmovant's] position'" cannot defeat a motion for summary

2    judgment, *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513–14 (N.D. Cal.

3    1995) (quoting *Liberty Lobby*, 477 U.S. at 252).  The evidence Alfa has put forward would require

4    speculation, rather than reasonable inferences, and accordingly does not survive summary

5    judgment.  *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere

6    allegation and speculation do not create a factual dispute for purposes of summary judgment.").

7        For the foregoing reasons, the Court finds that TCI has met its burden of showing that Alfa

8    cannot establish that TCI engaged in or approved of unlawful or improper conduct that caused the

9    CMC to disqualify Alfa from the 2018 RFP and blacklist it for three years.  Alfa has failed to

10   submit any evidence upon which a "fair-minded jury could return a verdict" for this theory of

11   causation, and the Court accordingly concludes that Alfa has not shown a genuine dispute of

12   material fact sufficient to defeat summary judgment.  *See Anderson*, 477 U.S. at 252.

13                  **c.      Effect of Finding No Genuine Dispute of Material Fact**

14       All of Alfa's interference-based claims rest on its allegation that TCI disrupted Alfa's

15   relationship with the CMC by partnering with AZG, which TCI knew "would utilize unlawful

16   means to obtain the SMMS Project to the exclusion of Alfa."  Am. Compl. ¶ 60 (tortious

17   interference with prospective economic advantage), ¶ 69 (aiding and abetting tortious interference

18   with prospective economic advantage), ¶ 78 (negligent interference with prospective economic

19   advantage), ¶ 85 (tortious interference with contract), ¶ 98 (aiding and abetting tortious

20   interference with contract).  Because the Court holds that Alfa has not raised a genuine dispute of

21   material fact as to the bribery theory of causation, *i.e.*, that TCI's actions caused the CMC to

22   disqualify and blacklist Alfa, Alfa cannot prove its claims for tortious interference with

23   prospective economic advantage (Claim 3); aiding and abetting the same (Claim 4); negligent

24   interference with prospective economic advantage (Claim 5); tortious interference with contract

25   (Claim 6); and aiding and abetting the same (Claim 7).  *See Korea Supply Co. v. Lockheed Martin*

26   *Corp.*, 29 Cal. 4th 1134, 1153 (2003) (tortious interference with prospective economic advantage

27   requires showing of causation); *Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*,

28   795 F.3d 1124, 1133 (9th Cir. 2015) (tortious interference with contract has same elements as

tortious interference with prospective economic advantage, except that defendant's conduct need not be wrongful independent of fact of interference with contract); *Richard B. Levine, Inc. v. Higashi*, 131 Cal. App. 4th 566, 573, 575 (2005) (aiding and abetting liability requires showing of an underlying tort); *Venhaus v. Shultz*, 155 Cal. App. 4th 1072, 1078–80 (2007) (negligent interference with prospective economic advantage has same elements as tortious interference, except that defendant's conduct need not be intentional).

However, as noted above, Alfa's claims for breach of contract and breach of the covenant of good faith and fair dealing—though requiring a showing of causation—are brought under two theories of causation. *See supra*, at Part IV(C)(2); Am. Compl. ¶¶ 47, 53. In light of the Court's holding that Alfa has not shown a genuine dispute of material fact as to the bribery-based theory of causation, both claims are foreclosed under the theory that TCI breached the Territory Agreement by "violating its ethical and legal obligations in securing the SMMS Project, including by violating or assisting [AZG] in a violation of the FCPA." Am. Compl. ¶ 47. The Court's finding leaves intact both claims to the extent they are based on TCI's alleged breach of the Territory Agreement by "partnering with [AZG] and not Alfa to submit a bid for the SMMS Project, in violation of [the] exclusivity provision." *Id.*

Accordingly, the Court will grant summary judgment as to all of Alfa's claims except those for breach of contract and breach of the implied covenant of good faith and fair dealing, to the extent these two claims are based on TCI's breach of the alleged exclusivity obligations imposed by the Territory Agreement. The Court need not and does not address TCI's other summary judgment arguments on Alfa's claims related to interference with prospective economic advantage and interference with contract. *See* Mot. 18–22.

### D.    Breach of the Implied Covenant of Good Faith and Fair Dealing

TCI's next argument related to a surviving claim is that Alfa's claim for breach of the implied covenant of good faith and fair dealing must be dismissed because it is duplicative of Alfa's breach of contract claim and seeks the same damages. *See* Mot. 22–23. Alfa counters that the two claims are not duplicative because Alfa bases its claim for breach of the implied covenant of good faith and fair dealing not only on TCI's alleged breach of the Territory Agreement, but on

United States District Court
Northern District of California

1   TCI's partnering with AZG because TCI knew that AZG "would utilize unlawful means to obtain

2   the SMMS Project."  *See* Opp'n 23–24; Am. Compl. ¶ 53.  As noted by the cases upon which TCI

3   relies, a claim for breach of the implied covenant of good faith and fair dealing is not duplicative

4   of a breach of contract claim where the former claim involves a showing of bad faith.  *See* Mot.

5   22–23; *see also Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990);

6   *Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 725 (N.D. Cal. 2014) ("[A] claim for breach of the

7   implied covenant may be made out by allegations that a defendant acted in bad faith to frustrate

8   the agreed common purpose of the contract.").  TCI does not submit any evidence regarding its

9   good faith, and accordingly has not met its initial burden of negating Alfa's claim for breach of the

10  implied covenant of good faith and fair dealing.  *See Nissan Fire & Marine Ins. Co.*, *Inc.*, 210

11  F.3d at 1102.  Further, the Court has found that Alfa has raised a genuine dispute of material fact

12  as to whether TCI engaged in or assisted AZG with exerting unlawful influence on the CMC.  *See*

13  *supra*, at Part IV(C)(1).  Lastly, although TCI argues that Alfa's claim fails because the Territory

14  Agreement permitted TCI to partner with AZG, *see* Mot. 23, Reply 14, the Court has found that

15  Alfa  has shown the existence of a genuine dispute of material fact as to the existence of

16  exclusivity obligations in the Territory Agreement.  *See supra*, at Part IV(B)(2).  The Court will

17  thus deny TCI's motion for summary judgment on Alfa's claim for breach of the implied covenant

18  of good faith and fair dealing on the ground that it is duplicative of the breach of contract claim.

19        **E.      Damages**

20        TCI's final argument is that Alfa's damages are impermissibly speculative.  *See* Mot. 23–

21  24.  Alfa alleges that TCI's breach of the Territory Agreement "resulted in Alfa's loss of the first

22  phase of the SMMS Project, its [de facto] loss of the second and third phases of the SMMS

23  Project, and cancellation of the Maintenance Contracts."  Am. Compl. ¶ 48.[2]

24        For both contract and tort actions, "anticipated profits dependent upon future events are

25  allowed where their nature and occurrence can be shown by evidence of reasonable reliability.  []

26

27  ───────────────

28  [2] Although the parties do not explain the phases in their briefing on the motion for summary
    judgment, the Amended Complaint explains that the SMMS project "contemplated three distinct
    phases, each of which were to be subject to a new solicitation."  Am. Compl. ¶ 20.

1   All of these [] cases recognize and apply the general principle that damages for the loss of

2   prospective profits are recoverable where the evidence makes reasonably certain their occurrence

3   and extent." *Kids' Univ. v. In2Labs*, 95 Cal. App. 4th 870, 883 (2002) (quoting *Grupe v. Glick*, 26

4   Cal. 2d 680, 692–93 (1945) (internal citations omitted).  With respect to the 2018 RFP, TCI argues

5   that Alfa has no damages because the CMC disqualified Alfa from the tender; Alfa cannot show it

6   was reasonably certain it would have won the bid even if it were not disqualified; and Alfa did not

7   have the equipment to complete the project even if it had won the bid.  Mot. 24.  As for the

8   "second and third phases" of the project, TCI asserts the damages are highly speculative because

9   the CMC has not issued a tender for the second or third phases, and TCI does not know if or when

10  such a tender will be forthcoming.  *Id.* at 25.  And as for the Maintenance Contracts, TCI states

11  that Alfa has not calculated lost profits, and Alfa cannot prove TCI caused Alfa to lose the

12  contracts.  *Id.*; Reply 14–15.  Alfa counters that its bid for the 2018 RFP, which would have been

13  made with TCI absent TCI's breach, would have won but for its disqualification rooted in TCI's

14  conduct; that it reserves the right to seek damages for the loss of the second and third phases of the

15  CMC's SMMS project; and that it has calculated its earnings for completion of the Maintenance

16  Contracts.  Opp'n 24–25.

17      Alfa has submitted evidence that the CMC was required to award the 2018 RFP to the

18  lowest price, technically compliant bid, and that its bid, which would have been made with TCI,

19  would in fact have been the lowest price, technically compliant bid.  *See* Owens Decl., Exh. 80 §

20  40-1; *id.* at Exh. 64.  The Court accordingly finds that Alfa has shown a genuine dispute of

21  material fact as to its ability to show damages based on the loss of the 2018 RFP resulting from

22  TCI's alleged breach of contract.

23      Alfa's damages with respect to the as-yet nonexistent phases two and three of the SMMS

24  project, however, are entirely speculative.  Alfa appears to concede the point by "reserv[ing] the

25  right to seek damages for loss of Phases 2 and 3 of the CMC Project once those phases are

26  announced."  Mot. 25.  The only case to which Alfa cites for this proposition, *Cordova v.*

27  *Greyhound Lines, Inc.*, No. 19-cv-00442, 2019 WL 1403297, at *2 (N.D. Cal. Mar. 28, 2019), is a

28  district court opinion on a motion to remand that discusses whether a complaint's reservation of

United States District Court
Northern District of California

1   rights puts damages at issue.  Alfa does not explain why *Cordova*—or any other case—permits it

2   to reserve damages for a contract that may never come to pass in an attempt to defeat summary

3   judgment.  Accordingly, the Court finds Alfa's damages arising from the second and third phases

4   of the SMMS project to be impermissibly speculative.  See *Vestar Dev. II, LLC v. Gen. Dynamics*

5   *Corp.*, 249 F.3d 958, 961 (9th Cir. 2001) ("It has long been settled in California that the proof

6   must establish with reasonable certainty and probability that damages will result in the future to

7   the person wronged.").

8       With respect to the two Maintenance Contracts, which were canceled on the same day Alfa

9   was blacklisted, the Court notes initially that Alfa faces a potentially difficult avenue of proof in

10  showing that TCI's alleged breach of its exclusivity obligations under the Territory Agreement

11  caused Alfa's loss of the Maintenance Contracts.  As the parties did not adequately brief this

12  theory of causation, *see supra*, at Part IV(C)(2)(a)–(c), the Court is not in a position to comment

13  on Alfa's ability to reach a damages analysis, and this holding should not be taken as such a

14  comment.  Should Alfa make the necessary showing to reach the question of damages due to the

15  loss of the Maintenance Contracts, the Court finds Alfa's submission of evidence regarding its

16  expected earnings of $495,000 on one contract and $420,000 on the other to be sufficient to defeat

17  summary judgment.  *See* Al Mumin Decl. ¶¶ 14–15.  Although TCI argues that Alfa must have

18  shown net profits, rather than revenue, *see* Reply 15, Alfa has proffered evidence indicating that it

19  would be "fairly simple" to identify Alfa's profit margin on the Maintenance Contracts.  *See*

20  Ulmer Decl., Exh. C ("Nov. 2022 Gorpinich Decl."), 262:24–263:18 ("[S]omebody from Alfa for

21  this particular maintenance contract . . . is able to identify [the margin], I believe, because it's [a]

22  fairly simple technique for the pricing.  There would be labor and time.  That's it.").  Based on

23  these submissions, the Court is satisfied that Alfa has shown with reasonable certainty that it could

24  establish damages from the loss of the Maintenance Contracts—should it reach the analysis at all.

25  **V.    ORDER**

26      For the foregoing reasons, the Court hereby ORDERS as follows:

27          1.  TCI's motion for summary judgment on the ground that Alfa's claims are barred by

28              claim and/or issue preclusion is DENIED.

United States District Court
Northern District of California

United States District Court
Northern District of California

2. TCI's motion for summary judgment on the ground that Alfa cannot show that the Territory Agreement imposed exclusivity obligations upon TCI is DENIED.

3. TCI's motion for summary judgment on the ground that Alfa cannot show unlawful influence is DENIED.

4. TCI's motion for summary judgment on the ground that Alfa cannot show that TCI's engagement in unlawful or improper conduct caused the CMC to blacklist Alfa and cancel its contracts is GRANTED IN PART, such that:

   a. Alfa's claims for (1) tortious interference with prospective economic advantage; (2) aiding and abetting tortious interference with prospective economic advantage; (3) negligent interference with prospective economic advantage; (4) tortious interference with contract; and (5) aiding and abetting tortious interference with contract are DISMISSED, and

   b. Alfa's claims for breach of contract and breach of the implied covenant of good faith and fair dealing are DISMISSED to the extent they are based on TCI's alleged breach of the Territory Agreement by engaging in unlawful or improper conduct that caused the CMC to blacklist Alfa and cancel its contracts.

5. TCI's motion for summary judgment is GRANTED IN PART with respect to Alfa's claimed damages arising out of the loss of the second and third phases of the SMMS project for its claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

//
//
//

1   6.   TCI's motion for summary judgment is otherwise DENIED, such that Alfa's claims

2        for breach of contract and breach of the implied covenant of good faith and fair

3        dealing remain intact to the extent they (1) are based on TCI's alleged breach of the

4        exclusivity obligations under the Territory Agreement, and (2) seek damages

5        arising from the loss of the first phase of the SMMS project and the loss of the

6        Maintenance Contracts.

7

8        **IT IS SO ORDERED.**

9   Dated: October 3, 2023

10

11  BETH LABSON FREEMAN
    United States District Judge